# Illinois Official Reports

## Appellate Court

---

**Swoboda v. Board of Trustees of the Village of Sugar Grove Police Pension Fund,**
**2015 IL App (2d) 150265**

---

| | |
|---|---|
| Appellate Court Caption | THOMAS SWOBODA, Plaintiff-Appellant, v. THE BOARD OF TRUSTEES OF THE VILLAGE OF SUGAR GROVE POLICE PENSION FUND and THE VILLAGE OF SUGAR GROVE, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-15-0265 |
| Filed | December 23, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 14-MR-721; the Hon. David R. Akemann, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Craig S. Mielke, of Foote Mielke Chavez & O'Neil, LLC, of Geneva, for appellant.<br><br>Michael Resis, of SmithAmundsen LLC, of Chicago, and Ellen L. Green and Julie A. Proscia, both of SmithAmundsen LLC, of St. Charles, for appellee Village of Sugar Grove.<br><br>Richard J. Reimer, Keith A. Karlson, and Brian J. LaBardi, all of Reimer, Dobrovolny & Karlson LLC, of Hinsdale, for appellee Board of Trustees of the Village of Sugar Grove Police Pension Fund. |

Panel            JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Hutchinson and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff, Thomas Swoboda, appeals from an order of the circuit court of Kane County affirming the decision of the Board of Trustees of the Village of Sugar Grove Police Pension Fund (Board) denying plaintiff's application for line-of-duty disability benefits and instead awarding him nonduty benefits. We affirm.

¶ 2      Plaintiff filed his application on February 4, 2013, and the Board later granted the Village of Sugar Grove (Village) leave to intervene in the proceedings. Evidence admitted at the hearing on plaintiff's application establishes that plaintiff joined the Sugar Grove police department (Department) in 2005. On October 15, 2011, plaintiff participated in physical-fitness testing conducted by the Department. Plaintiff testified that he learned about the testing "[e]ither by e-mail from Chief Sauer or verbal." Officer William Bruno supervised the testing.

¶ 3      As part of the testing, plaintiff performed a bench press. Asked how much weight he was required to bench press, plaintiff responded, "It was a certain percentage of your weight. It was probably 200-something, around there." While performing the bench press, plaintiff felt a "pull or strain" in his shoulder. Plaintiff was able to complete the testing. Later that day he felt as though he had pulled a muscle in his shoulder. He sought treatment for his shoulder a few days later. Initially, a course of physical therapy was prescribed, but it did not result in any improvement. Surgery and additional physical therapy resulted in only slight improvement. A second surgical procedure produced no improvement, and plaintiff was unable to return to work as a police officer.

¶ 4      Bruno testified that he administered the physical-fitness testing. According to Bruno, the chief of police, Brad Sauer, told him to conduct the testing in the same manner that it had been conducted the previous year. Exhibits admitted at the hearing include an e-mail concerning fitness testing conducted in 2010. That e-mail indicated that all officers would be required to participate in the testing pursuant to the collective bargaining agreement between the Village and its officers and that the testing would consist of a 1.5-mile run, a 300-meter run, sit-ups, and a "[b]ench press–75% of body weight up to a maximum of 175 pounds or 30 consecutive push ups." Asked whether participation in the testing was mandatory, Bruno responded:

> "I don't know. I sent the e-mail out saying let me know when you can do it on this weekend. If they showed up, they showed up. If they didn't show up, I had no idea what would happen."

¶ 5      Bruno recorded the results of the tests. He turned the results over to Sauer, but, according to Bruno, "what he did with it was a mystery." Bruno testified that not every officer passed the tests. Bruno had no idea what happened to the officers who did not. Asked if he was aware of any civilian occupations with similar physical-fitness requirements, Bruno responded, "No. I mean, besides the NFL where they have a physical before camp. That's about it."

- 2 -

¶ 6    Based on this evidence, the Board found that plaintiff was entitled only to a nonduty disability pension. Plaintiff filed a timely complaint for administrative review and the trial court affirmed the Board's decision. This appeal followed.

¶ 7    On appeal from a judgment in an administrative-review proceeding, we review the agency's decision, not the trial court's. *Fedorski v. Board of Trustees of the Aurora Police Pension Fund*, 375 Ill. App. 3d 371, 372 (2007). As we noted in *Fedorski*:

"The agency's findings of fact will be upheld unless against the manifest weight of the evidence, but rulings of law are reviewed *de novo*. [Citation.] An administrative agency's decision on a mixed question of fact and law will be upheld unless clearly erroneous. [Citation.] 'A mixed question exists where the historical facts are admitted or established, the rule of law is undisputed, and the only issue is whether the facts satisfy the settled statutory standard.' [Citation.]" *Id.* at 372-73.

¶ 8    As pertinent here, section 3-114.1(a) of the Illinois Pension Code (Code) (40 ILCS 5/3-114.1(a) (West 2012)) provides:

"If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension equal to *** 65% of the salary attached to the rank on the police force held by the officer at the date of suspension of duty or retirement ***."

Under section 3-114.2 of the Code (40 ILCS 5/3-114.2 (West 2012)), a police officer who becomes disabled as a result of any cause other than an act of duty is entitled to a pension equal to 50% of the salary attached to the officer's rank at the date of suspension of duty or retirement.

¶ 9    For purposes of section 3-114.1(a), the definition of "act of duty" set forth in section 5-113 of the Code (40 ILCS 5/5-113 (West 2012)) applies. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 540-41 (1997). Section 5-113 provides, in pertinent part, that an act of duty is "[a]ny act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment." 40 ILCS 5/5-113 (West 2012). In accordance with section 5-113, the test for determining whether an act is an "act of duty" consists of two prongs: (1) the act must inherently involve special risk "not ordinarily assumed by a citizen in the ordinary walks of life" and (2) the act must be imposed by statute, ordinance, or police regulation. *Id.*

¶ 10    In its written decision, the Board concluded that plaintiff's participation in the fitness testing did not involve a special risk. The Board made no specific finding with respect to the second prong–*i.e.*, whether plaintiff was performing an act imposed by statute, ordinance, or police regulation. Plaintiff notes that the collective bargaining agreement between the Village and its officers gave the Department the authority to require fitness testing. In plaintiff's view, the second prong was satisfied inasmuch as the collective bargaining agreement was a "creature of Illinois statute"–namely section 7 of the Illinois Public Labor Relations Act (5 ILCS 315/7 (West 2012)). The Village responds that that provision "simply imposes a 'duty to bargain' on a public employer and the exclusive representative of public employees; it does not in any way address the duties imposed on a police officer." The Village further argues that the

record shows that plaintiff was injured when he attempted to bench press 200 pounds, even though, under the test protocol, he would have been required to bench press only 75% of his body weight up to a maximum of 175 pounds. Not long after plaintiff was injured, his weight was recorded at 220 pounds. At that weight, he would have been required to bench press 165 pounds to pass the test. Plaintiff points to evidence in the record indicating that there was no bathroom scale available when the bench-press test was conducted and that Bruno asked each officer how much he or she weighed. That does not explain why plaintiff attempted to bench press 25 pounds more than was necessary to pass the test. It is not clear from the record whether it was plaintiff's decision to do so or whether he did so at someone else's behest.

¶ 11     We need not decide whether plaintiff was required to bench press 200 pounds (as opposed to some lower weight). Nor need we decide whether, by virtue of the collective bargaining agreement and the Illinois Public Labor Relations Act, participation in fitness testing satisfies the second prong of the "act of duty" test. Because the bench-press test did not involve "special risk, not ordinarily assumed by a citizen in the ordinary walks of life" (40 ILCS 5/5-113 (West 2012)), even if we were to resolve those questions in plaintiff's favor, his attempt to perform the test would not constitute an "act of duty."[1]

¶ 12     In *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518, 521 (1986), our supreme court held that an activity need not be inherently dangerous to give rise to a special risk. The *Johnson* court noted that "[p]olice officers assigned to duties that involve protection of the public discharge those duties by performing acts which are similar to those involved in many civilian occupations." *Id.* In determining whether an officer is entitled to a line-of-duty benefit, the "crux is the capacity in which the police officer is acting." *Id.* at 522. What this means is that, although *Johnson* "preserves the requirement that an act of duty be something involving a risk not shared by ordinary citizens" (*Morgan v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 172 Ill. App. 3d 273, 276 (1988)), courts must look beyond "the precise mechanism of injury" (*Alm v. Lincolnshire Police Pension Board*, 352 Ill. App. 3d 595, 599 (2004)) when determining whether an injured police officer was engaged in an act of duty. Accordingly, "an officer performing duties involving special risks will be entitled to line-of-duty benefits even if the immediate cause of injury is an act involving only an ordinary risk." *Id.*

¶ 13     In *Johnson*, a police officer assigned to direct traffic was summoned by a citizen for assistance in connection with a traffic accident. The officer slipped and sustained a disabling injury while crossing the street to respond. In holding that the officer was entitled to a line-of-duty disability pension, the court reasoned that the officer "was discharging his sworn duties *** by responding to the call of a citizen to investigate an accident." *Johnson*, 114 Ill. 2d at 522. While the precise mechanism of the injury (slipping while crossing the street) did not represent any special risk of police work, it did not disqualify the officer from receiving line-of-duty benefits for a disabling injury incurred while discharging a duty (investigating an accident) that involved the protection of the public. *Id.* The court noted that "[t]here is no

[1]For its part, the Board contends that it found "as a matter of fact, [that] Plaintiff failed to meet his burden to prove [that] he was injured while engaging in a mandatory test." In actuality, the Board made no such finding (either expressly or impliedly). Although the Board's findings of fact are entitled to deference, we cannot defer to a finding that was not made, particularly where–as the Board concedes is the case here–the record contains evidence in support of an opposite finding.

- 4 -

comparable civilian occupation to that of a traffic patrolman responding to the call of a citizen." *Id.* Similarly, in *Wagner v. Board of Trustees of the Police Pension Fund*, 208 Ill. App. 3d 25 (1991), the court held that an officer serving a notice to appear was performing a duty that involved a special risk and was therefore entitled to a line-of-duty disability pension for a disabling injury that occurred when his leg fell through a rotted plank on a porch. It did not matter that the precise mechanism of the injury–walking on a porch–involved no special risk.

¶ 14    At the same time, it is abundantly clear that not every job-related activity is an act of duty. For instance, clerical duties of police work do not involve a special risk, so an officer who sustains disabling injuries while performing such duties is not entitled to a line-of-duty disability pension. *Morgan v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 172 Ill. App. 3d 273 (1988). Similarly, in *Fedorski* we held that an officer performing the duties of an evidence technician was acting in a capacity involving only an ordinary risk when the officer suffered a disabling injury in a motor-vehicle accident while returning to the police station after taking photographs of a crime suspect at the county jail.

¶ 15    In the case before us, the Board concluded as follows in its written decision:

> "Civilians routinely lift weights and exercise for work or personal reasons. The act of bench-pressing weights is not unique to police work. Many civilians lift weights on a regular basis. The risk of injury while lifting weights is not unique to police work. Civilians who work out share the same risk."

Plaintiff contends, however, that "[t]he testimony of Officer Bruno confirmed that no civilian *occupations* (other than professional sports) have similar physical requirements." (Emphasis added.) Plaintiff insists that the record shows that ordinary citizens do not "perform similar fitness tests which *require* a bench press of 75% of body weight." (Emphasis added.) Thus, it is plaintiff's position that the salient inquiry is not whether civilians assume the risk of weightlifting injuries, but whether they assume that risk *in their occupations*. Whether this view is correct depends on the meaning of the phrase "ordinarily assumed by a citizen in the ordinary walks of life" (40 ILCS 5/5-113 (West 2012)); an act involving such a risk is *not* an "act of duty" under section 5-113. The interpretation of the pertinent statutory language presents a question of law, subject to *de novo* review. See *Davis Bancorp, Inc. v. Board of Review of the Department of Employment Security*, 393 Ill. App. 3d 135, 142 (2009).

¶ 16    As a matter of syntax, there are at least two ways to parse the phrase "ordinarily assumed by a citizen in the ordinary walks of life." First, "by a citizen" and "in the ordinary walks of life" may be treated as separate prepositional phrases.[2] Second, "by a citizen in the ordinary walks of life" may be treated as a single prepositional phrase containing the two aforesaid prepositional phrases. The significance of the distinction is that, in the first case, "in the ordinary walks of life" modifies "assumed," whereas in the second case, "in the ordinary walks of life" modifies "citizen." Stated differently, in the first case "by a citizen" indicates *by whom* the risk is assumed and "in the ordinary walks of life" pertains to *the manner in which* (*i.e.*, *how*) the risk is assumed. In the second case, the entire prepositional phrase "by a citizen in the ordinary walks of life" indicates *by whom* the risk is assumed; how the risk is assumed is immaterial.

---

[2]The prepositional phrase "of life" is nested within the phrase "in the ordinary walks of life."

¶ 17        If the term "walks of life" referred purely to occupations, both cases might produce reasonable interpretations. However, "walks of life" denotes both occupation *and social class*. As plaintiff notes, the term "walk[s] of life" has been defined as "referring to different types of jobs and different levels of society." Cambridge Dictionary, http://dictionary.cambridge.org/ us/dictionary/english/walk-of-life?a=british#translations (last visited Dec. 2, 2015). It is by no means clear how the class aspect of the term "walks of life" corresponds to particular risks. Thus, treating the phrase "by a citizen in the ordinary walks of life" as a single prepositional phrase produces the more sensible interpretation of section 5-113. As applied to "citizens," we can readily comprehend what that phrase signifies: ordinary citizens from across the social spectrum and from various occupations. If a particular risk is one that is ordinarily assumed by such citizens, it is not a "special risk." Citizens in ordinary walks of life engage in weightlifting. Whether they do so occupationally or recreationally is of no moment. The risk of sustaining a weightlifting injury is not a "special risk."

¶ 18        *Byrnes v. Retirement Board of Policemen's Annuity & Benefit Fund*, 339 Ill. App. 55 (1949), supports our interpretation of section 5-113. In *Byrnes*, an off-duty police officer and another individual were in a rowboat that overturned in Lake Michigan and began to drift away from the shore. As the officer's companion clung to the overturned boat, the officer tried to swim to a breakwater for help. Before reaching the breakwater, the officer drowned. The *Byrnes* court concluded that the officer's death was not the result of an act of duty. The act was not imposed on the officer by a statute, ordinance, or police department rule, *nor* did it involve a "special risk." *Id.* at 60. According to the court, "it was simply an act which any ordinary man in an ordinary walk of life would have attempted to perform if he could swim." *Id.* Thus, in *Byrnes*, the salient inquiry was not whether the risk was associated with civilian *occupations* (which do not ordinarily entail swimming from overturned rowboats) but whether it was associated with civilian life generally.

¶ 19        *Alm* also supports our analysis. In that case, this court held that an officer injured while assigned to bicycle patrol was entitled to a line-of-duty disability pension. Notably, the majority focused not merely on the fact that, in ordinary walks of life, riding a bicycle is a recreational activity. Rather, the majority noted how bicycle patrol duty differed from recreational cycling:

> "While on patrol, plaintiff faced risks not ordinarily encountered by civilians. He was required to ride his bicycle at night over varying terrain, looking after his own personal safety while also remaining vigilant in the performance of his patrol duties. Plaintiff was also carrying a significant amount of additional weight. Under these conditions, risks include falls and collisions as well as dangerous encounters with unsavory elements of society. This particular duty has no clear counterpart in civilian life." *Alm*, 352 Ill. App. 3d at 601.

In our view, this approach is sound as a matter of policy. Whether a risk encountered in civilian life is occupational or nonoccupational has little bearing on whether it approximates the types of dangers for which an officer should receive an increased disability benefit.[3] Thus, in prior

_____

[3]We recognize that the *Johnson* court expressly mentioned only occupational risks of civilian life when it held that an officer performing his duty to protect the public faces a "special risk." *Johnson*, 114 Ill. 2d at 522 ("There is no comparable civilian occupation to that of a traffic patrolman responding to the call of a citizen."). However, the court was simply illustrating the distinction between the *capacity*

- 6 -

cases where line-of-duty disability pensions have been awarded, the officers were injured while engaged in activities involving the protection of public safety. See *Summers v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 2013 IL App (1st) 121345, ¶ 44. Although the definition of "act of duty" is not strictly limited to activities involving the protection of public safety (*id.*), it is not so broad as to embrace physical-fitness activities in which individuals in ordinary walks of life participate.

¶ 20 For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 21 Affirmed.

---

in which an officer is acting and the *specific act* causing injury. The court did not hold that ordinary nonoccupational risks that are commonly encountered in civilian life somehow become "special risks" when encountered by a police officer.