2018 IL App (4th) 170232
NO. 4-17-0232
IN THE APPELLATE COURT
OF ILLINOIS
FOURTH DISTRICT

FILED
April 5, 2018
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| SHAWNA GILLIAM, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| THE BOARD OF TRUSTEES OF THE CITY OF | ) | No. 16MR120 |
| PONTIAC POLICE PENSION FUND and THE CITY | ) | |
| OF PONTIAC, a Municipal Corporation, | ) | Honorable |
| Defendants-Appellants. | ) | Robert M. Travers, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice Turner concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendants, the Board of Trustees of the City of Pontiac Police Pension Fund (Board) and the City of Pontiac (City), appeal from the circuit court's decision reversing the Board's decision to deny plaintiff, Shawna Gilliam, "line-of-duty" disability benefits. Defendants insist plaintiff failed to prove she was injured during an "act of duty." We disagree and affirm the decision of the circuit court.

¶ 2                     I. BACKGROUND

¶ 3    On April 3, 2012, plaintiff, a Pontiac police officer, was injured during a voluntary bicycle-patrol training session. As a result of this injury, three years later, on June 2, 2015, plaintiff filed an application with the Board requesting a "line-of-duty" disability pension pursuant to section 3-114.1(a) of the Illinois Pension Code (40 ILCS 5/3-114.1(a) (West 2010)).

In the alternative, plaintiff requested a "non-duty" disability pension. In December 2015, the City filed a motion to intervene in plaintiff's application. Without objection, the Board allowed the City's motion.

¶ 4                                     A. The Administrative Hearing

¶ 5         In May 2016, the Board conducted a hearing on plaintiff's application. The Board heard testimony from plaintiff, the instructor of the bicycle-patrol training session, and the police chief and reviewed approximately 20 exhibits, most of which consisted of plaintiff's medical records.

¶ 6         Plaintiff testified she became a Pontiac police officer on January 1, 2002, and throughout her tenure, she was employed as a patrol officer. On April 2, 2012, she participated in a training program taught by Charlie Summers, an International Police Mountain Bike Association (IPMBA) instructor. Two other Pontiac police officers participated as well. The City provided the bicycle she used during training. Plaintiff was on duty and wore her bicycle-patrol uniform, equipped with her vest, duty belt, and service weapon during the course. According to plaintiff, she was participating in the training in order to be certified for police bicycle-patrol duties. Although she knew how to ride a bicycle, this course was intended to teach "tactics" specifically used by police officers while responding to calls and conducting traffic stops. On the day of her injury, plaintiff was being trained on how to conduct a felony pursuit. Specifically, she was engaged in a maneuver called "parallel curb ascending." She had successfully performed the maneuver approximately six times before she fell onto her right arm, injuring her forearm and wrist. She testified that her arm was smashed between the butt of her service weapon and the street.

¶ 7    Plaintiff, with Summers's assistance, immediately completed an injury report, but plaintiff participated in the remainder of the four-day training session. After the training, plaintiff sought medical treatment on April 5, 2012, and was diagnosed with a triangular fibrocartilage complex (TFCC) tear requiring three surgeries. The treating and examining physicians all agreed she was unable to carry out her duties as a patrol officer due to the injury. In December 2015, the Pontiac Police Department notified her she was being placed on nonpay status of employment.

¶ 8    Charlie Summers, a sergeant with the Illinois State University Police Department, testified on the City's behalf. He said while he was teaching the IPMBA basic course, he saw plaintiff fall while attempting a parallel curb ascent. He described the maneuver as one used to "rapidly get out of the roadway to get up on the curb. It can be a defensive movement or an offensive movement depending on what your role is at that time, but most of the time it's used to divert from getting into an accident with a car or something like that. It's a diversive action." He said he does not teach civilians this technique; he only teaches the "police part of it."

¶ 9    Chief James Woolford testified on behalf of the City. He explained that in order to become a bicycle-patrol officer, an officer can either request to attend the training class or wait until information about an upcoming training class is disseminated. Woolford said becoming a bicycle-patrol officer was entirely voluntary. The following exchange occurred:

"Q. And describe the nature of the class for us.

A. The nature of the class is a four-day class to learn basic police officer bicycle skills, to patrol in uniform and handle calls within your designated patrol area on a bicycle.

* * *

Q. Okay. Are there any educational or experience prerequisites before an officer can attend the class?

A. We don't have anything set in stone, but it's typically an officer off of probation, so we want an officer who is no longer overwhelmed by just learning their patrol job, so—

Q. Does there have to be any extensive pre-bicycle riding experience before they take the course?

A. We've—no, we've never said anything like that. It's useful to be a bike enthusiast or willing to do it, but we have never set any hard rules or any requisites.

Q. Okay. And have you taken the class?

A. I have.

Q. All right. Currently right now on the department, how many officers are there that have taken the class and that are available to actually patrol the streets on a bike?

A. Probably four or five officers that are bicycle certified, and a number of those hold rank or are about to hold rank, so actually able to perform bike patrol, I probably have two officers that are—that would be patrol officers that would be able to do it.

Q. Okay. Back in April of 2012, was there any state law or regulation that required an officer to obtain a certification or go through this training course before performing bicycle patrol duties?

A. No.

Q. Once a city officer takes the bicycle class and actually becomes part of the bicycle program, are they required to continue participating in the program?

A. No.

Q. Can an officer voluntarily withdraw from the program and no longer patrol?

A. They have.

Q. Explain to us the process of how that would occur.

A. Well, there's only one example that I can think of. It was an officer who's a corporal who did not enjoy doing bicycle patrol and asked to be removed from the bicycle patrol unit, so he was granted that.

Q. Okay. Would an officer suffer any adverse employment action or other impact on their terms or conditions of employment if they voluntarily chose not to participate in the program anymore?

A. No."

¶ 10    According to Woolford, plaintiff had expressed interest in the training class, so he asked her to find a bicycle that would fit her properly. She found one. Woolford arranged for the training program, which consisted of classroom and hands-on sessions. The classroom portion was conducted in the Pontiac Police Department training room. Woolford said two other Pontiac police officers attended the class with plaintiff. Although the program was voluntary, once the officer decided to volunteer for the bicycle-patrol position, the officer was expected to perform the duties properly and in accordance with the department's regulations and subject to Woolford's command. Woolford agreed that, once plaintiff accepted the bicycle-patrol training, she was expected to do as her instructor said; otherwise, Woolford would have disciplined her.

¶ 11       Woolford testified plaintiff could not officially become a bicycle-patrol officer until she successfully completed the police cyclist course. Plaintiff did so and became a "bike officer."

¶ 12                          B. The Board's Findings

¶ 13       After considering the evidence, the Board voted 3-2 to deny plaintiff's request for a "line-of-duty" disability pension. The Board found the plaintiff's disability was not incurred by or a result from the performance of an "act of duty" because (1) the April 2012 accident did not involve an act that inherently involved a special risk and (2) the mandatory nature of the bicycle training course did not mean she was engaged in an "act of duty." In another vote, the Board unanimously voted to award her a "non-duty" disability pension.

¶ 14                          C. The Circuit Court Proceedings

¶ 15       Plaintiff appealed the decision of the Board by filing a complaint for administrative review in the circuit court. After a December 2016 hearing, the circuit court (1) reversed the Board's order, finding its decision to be clearly erroneous, and (2) granted plaintiff's "line-of-duty" disability pension. In a written order explaining its finding, the circuit court held plaintiff was injured while performing an "act of duty involving special risk" and her disability was caused by the injuries she sustained in the April 2012 bicycle-training accident during the mandated training.

¶ 16       This appeal followed.

¶ 17                          II. ANALYSIS

¶ 18       On appeal, the Board claims plaintiff's injury was not incurred in the performance of an "act of duty" as defined by section 3-114.1 of the Pension Code (40 ILCS 5/3-114.1 (West

2014)) so as to entitle her to receive a "line-of-duty" disability pension. We disagree with the Board and affirm the circuit court's judgment.

¶ 19                          A. Standard of Review

¶ 20        In administrative review cases, this court's role is to review the decision of the administrative agency, not the decision of the circuit court. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 386 (2010). In reviewing the decision of an administrative agency, " '[t]he applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law.' " *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008) (quoting *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005)). This court will reverse a ruling on a question of fact only if it is against the manifest weight of the evidence. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532 (2006). Questions of law are reviewed *de novo*. *Marconi*, 225 Ill. 2d at 532. Mixed questions of law and fact are reviewed under the clearly erroneous standard. *Marconi*, 225 Ill. 2d at 532.

¶ 21        The Illinois Supreme Court has recognized the clearly erroneous standard of review as appropriate when review of an administrative agency's decision "involves an examination of the legal effect of a given set of facts" such that it constitutes "a mixed question of fact and law." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). That case involved a collective-bargaining dispute between the city and the firefighters union. *City of Belvidere*, 181 Ill. 2d at 193. According to the Illinois Public Labor Relations Act, to bargain collectively meant " 'to negotiate in good faith with respect to wages, hours and other conditions of employment.' " *City of Belvidere*, 181 Ill. 2d at 203 (quoting 5 ILCS 315/7 (West

1994)). The Illinois State Labor Relations Board examined whether, in the collective-bargaining context, the city's decision to contract out for paramedic services affected the "wages, hours and other conditions" of the firefighters' employment. *City of Belvidere*, 181 Ill. 2d at 205. The supreme court characterized this inquiry as a question of fact. *City of Belvidere*, 181 Ill. 2d at 205. The court further determined that the board's analysis involved a question of law because the phrase " 'wages, hours and other conditions of employment' " is "a legal term that requires interpretation." *City of Belvidere*, 181 Ill. 2d at 205. The court therein adopted the "clearly erroneous" standard to address such mixed questions of law and fact. *City of Belvidere*, 181 Ill. 2d at 205.

¶ 22        A few years later, the supreme court reviewed a decision of the Department of Employment Security (Department) to determine if it had erred in finding that AFM Messenger Service delivery drivers were "independent contractors" within the meaning of section 212 of the Unemployment Insurance Act (Act) (820 ILCS 405/212 (West 2000)). *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 381 (2001). In finding the clearly erroneous standard of review to be appropriate, the court stated, in part, the following:

"In the present case, the Department's decision also presents a mixed question of law and fact. Its decision is, in part, factual because it involves considering whether the facts support the agency's finding that the AFM drivers are employees and not independent contractors under section 212. Nevertheless, the Department's decision also concerns a question of law because the three statutory requirements for independent contractor status set forth in section 212 (freedom from control and direction, performance of services outside the usual course or places of business, and establishment of an independent business) are

- 8 -

comprised of legal terms and concepts requiring interpretation." *AFM Messenger Service, Inc.*, 198 Ill. 2d at 392.

¶ 23    In the present case, the Board was tasked with determining whether plaintiff was injured in the performance of an "act of duty" as that term is defined in section 5-113 of the Pension Code (40 ILCS 5/5-113 (West 2014)). In that context, "act of duty" was a legal term, which required the Board's interpretation. Therefore, part of its inquiry necessarily involved a question of law. However, the Board's decision also involved a factual determination because it was required to examine whether, under the particular facts, plaintiff's participation in a bicycle-patrol training program was an act of police duty involving "special risk" such that it constituted an "act of duty."

¶ 24    Because the Board's decision in this case finding plaintiff was not injured in the performance of an "act of duty" presents a mixed question of law and fact, we conclude that our review is governed by the clearly erroneous standard. See also *Merlo v. Orland Hills Police Pension Board*, 383 Ill. App. 3d 97, 100 (2008) (pension board's determination that the petitioner was injured while performing an "act of duty" properly reviewed under the clearly erroneous standard); *Jones v. Board of Trustees of the Police Pension Fund*, 384 Ill. App. 3d 1064, 1068 (2008) ("This court tends to agree with the *Merlo* court, that an examination of the legal effect of a given set of facts presents a mixed question of fact and law, requiring the clearly erroneous standard of review."). But see *White v. City of Aurora*, 323 Ill. App. 3d 733, 735 (2001) (pension board's denial of "line-of-duty" benefits is reviewed *de novo*); *Alm v. Lincolnshire Police Pension Board*, 352 Ill. App. 3d 595, 598 (2004) (pension board's denial of "line-of-duty" benefits is reviewed *de novo*). Under the clearly erroneous standard, we afford a degree of deference to the Board's decision and will reverse only upon a finding that a definite

mistake was committed. See *AFM Messenger Service, Inc.*, 198 Ill. 2d at 395 ("[T]he agency decision will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948))).

¶ 25                    B. The Pension Code and the Act of Duty Standard

¶ 26          Section 3-114.1(a) of the Pension Code provides as follows:

"If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension ***.

A police officer shall be considered 'on duty' while on any assignment approved by the chief of the police department of the municipality he or she serves, whether the assignment is within or outside the municipality." 40 ILCS 5/3-114.1(a) (West 2014).

The Pension Code defines an "act of duty" as follows:

"Any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment; or any act of heroism performed in the city having for its direct purpose the saving of the life or property of a person other than the policeman." 40 ILCS 5/5-113 (West 2014).

¶ 27                                C. Special Risk

¶ 28    It is well settled that to qualify for line-of-duty disability benefits it is not enough that a police officer was injured while on duty. *Morgan v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 172 Ill. App. 3d 273, 276 (1988). Rather, she must be performing an act involving a special risk not shared by ordinary citizens. See 40 ILCS 5/5-113 (West 2014); *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518, 522 (1986). Not all police functions involve " 'special risk.' " *Jones*, 384 Ill. App. 3d at 1070.

¶ 29    The seminal case interpreting "act of duty" and "special risk" is *Johnson*. There, the supreme court considered whether a police officer on traffic patrol who slipped and fell while crossing the street in an effort to respond to a citizen's request for help was performing an "act of duty." *Johnson*, 114 Ill. 2d at 522. The court noted "[w]hen a policeman is called upon to respond to a citizen, he must have his attention and energies directed towards being prepared to deal with any eventuality." *Johnson*, 114 Ill. 2d at 522. The court held the officer's conduct constituted an "act of duty" as defined in the Pension Code. *Johnson*, 114 Ill. 2d at 522-23. The court noted that conduct involving a "special risk" is not limited to " 'inherently dangerous' activities." *Johnson*, 114 Ill. 2d at 521. The crux of the inquiry is not whether the officer was injured "*by* [the] act of duty" but instead whether the injury occurred " '*in the performance of an act of duty*.' " (Emphasis in original.) *Johnson*, 114 Ill. 2d at 522 (quoting Ill. Rev. Stat. 1983, ch. 108$^1$/$_2$, ¶ 5-154). The capacity in which the police officer was acting is the ultimate inquiry. *Johnson*, 114 Ill. 2d at 522.

¶ 30    Since *Johnson*, many courts have relied on the supreme court's findings therein to analyze whether an officer's conduct qualified for "line-of-duty" pension benefits. For example, the First District determined that a police officer was not entitled to line-of-duty benefits after he became disabled while attempting to sit down at a desk to fill out a police report. *Morgan*, 172

Ill. App. 3d at 274. In that case, the chair rolled out from under the police officer, and he was injured. *Morgan*, 172 Ill. App. 3d at 274. The court reasoned that filling out police reports did not involve any "special risk not ordinarily assumed by a citizen in the ordinary walks of life." *Morgan*, 172 Ill. App. 3d at 276-77.

¶ 31 Likewise, the Second District determined that a police officer was not entitled to line-of-duty benefits after he became disabled while exiting his police car to place a traffic ticket on a windshield. *White*, 323 Ill. App. 3d at 736. The court found the policeman's act did not involve any special risk not ordinarily assumed by civilians. *White*, 323 Ill. App. 3d at 737.

¶ 32 Other courts have determined that certain conduct constitutes an "act of duty" involving a special risk. For example, this court has previously determined that an officer on routine patrol, who was injured as a result of a traffic accident, was entitled to line-of-duty benefits because he faced "special risk" while on patrol. *Jones*, 384 Ill. App. 3d at 1074. Under similar circumstances, the First District also found a police officer, who was responding to a call of juveniles stacking concrete blocks, was performing an "act of duty" when he was injured while attempting to remove the hazard by unstacking the blocks. *Merlo*, 383 Ill. App. 3d at 102-03.

¶ 33 Other courts have likewise relied on *Johnson* and found that an officer injured in the performance of an act of duty was entitled to line-of-duty disability benefits. See *Wagner v. Board of Trustees of the Police Pension Fund*, 208 Ill. App. 3d 25, 29 (1991) (officer suffered multiple injuries to his knee while on duty); *Alm*, 352 Ill. App. 3d at 601 (officer riding a bicycle on patrol); and *Sarkis v. City of Des Plaines*, 378 Ill. App. 3d 833, 841 (2008) (officer injured his shoulder while raising a railroad crossing gate). Of these, we find the facts and pertinent analysis in *Alm* particularly helpful to our analysis in the case before us.

¶ 34    In *Alm*, the officer injured his knee while pedaling a bicycle on bicycle patrol. *Alm*, 352 Ill. App. 3d at 601. The court emphatically rejected the Board's argument that the officer was simply riding a bicycle, noting the "Board misse[d] the point." *Alm*, 352 Ill. App. 3d at 602. The court stated, relying on *Johnson*, the focus should not be on the officer's "precise physical act at the moment of the injury" but on "the *capacity* in which the officer [was] acting." (Emphasis in original.) *Alm*, 352 Ill. App. 3d at 602 (citing *Johnson*, 114 Ill. 2d at 522). That is, a bicycle-patrol officer does not merely ride a bicycle as any ordinary citizen can and often does. Instead, the bicycle-patrol officer faces special risks not faced by ordinary citizens, including riding at night, remaining diligent on patrol while watching out for his own safety, and carrying additional weight with his service-oriented equipment. *Alm*, 352 Ill. App. 3d at 601. The court stated:

> "Under these conditions, risks include falls and collisions as well as dangerous encounters with unsavory elements of society. This particular duty has no clear counterpart in civilian life. Therefore, we find that the bicycle patrol performed by plaintiff involved special risk. Consequently, he was performing in a capacity that amounted to an act of duty such that he was entitled to line-of-duty benefits." *Alm*, 352 Ill. App. 3d at 601.

¶ 35    In this case, plaintiff was engaged in officer training for bicycle patrol at the time she was injured. According to the instructor, the training consisted of classroom training and hands-on techniques, both specifically designed for police officers. During the hands-on portion, the instructor taught the officers "slow speed skills, *** front wheel lifts, *** braking techniques, *** curb ascents and descents, dismounts, various dismounts." This particular training course was intended only for police officers and was designed to train the officers on the

techniques to be utilized while on patrol. On cross-examination by plaintiff's counsel, the instructor agreed that the following description found on the IPMBA's website accurately summarized the course.

> "Be prepared for the street! This essential training combines Emergency Vehicle Operations for bike officers with patrol procedures, tactics, night operations, scenarios, and basic bike maintenance and on-the-road repairs. Learn to ride like a pro, avoid crashes and use your bike to foil the bad guys every time. Off-road riding and bike-specific live-fire exercises may be added at the instructor's discretion." *IPMBA Training: About the Courses*, Int'l Police Mountain Biking Ass'n, http://ipmba.org/training/about-the-courses (last visited Apr. 4, 2018).

This description of the course alone reveals the special risks associated with bicycle patrol—risks specific to officers and not encountered by ordinary citizens.

¶ 36    The fact plaintiff was injured during a training exercise rather than on actual patrol is of no consequence. See, *e.g.*, *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 54 (not disputed that an injury to a fireman that occurred during a training exercise constituted an injury entitling the fireman to a line-of-duty disability). See also *Carr v. Ward*, 506 N.Y.S.2d 338, 340 (App. Div. 1986) (New York police officer entitled to line-of-duty disability when he was injured while boxing in a training exercise); *Warner v. Wurm*, 254 S.W.3d 148, 153 (Mo. Ct. App. 2008) (Missouri police officer injured during police training was entitled to service-related disability benefits). Indeed, at oral arguments, defendants acknowledged that line-of-duty benefits *could* be awarded to an officer injured during certain types of training. For example, counsel agreed that an officer injured during firearms training or

special weapons and tactics (SWAT) training could potentially receive line-of-duty pension benefits. Thus, counsel agreed the fact that plaintiff here was injured during a *training* exercise was not dispositive of the issue. Rather, defendants claim, the dispositive issue is that plaintiff was injured while attempting a bicycle maneuver that did not involve a special risk. We disagree.

¶ 37 It is clear, from this court's review of the line of cases interpreting the pertinent section of the Pension Code, the courts analyze the various capacities in which the individual officers are acting at the time of their injury. Following *Johnson*, it appears the courts focus on the circumstances involved and the overall risk associated with those circumstances. Having a chair roll out from underneath the officer as he attempted to sit in the chair involved no activity or risk unique to the police profession. See *Morgan*, 172 Ill. App. 3d at 277. Likewise, exiting a vehicle to place a citation on another vehicle involved no activity or risk unique to the police profession. See *White*, 323 Ill. App. 3d at 736. Further, lifting weights as part of a fitness test involved no activity or risk unique to the police profession. See *Swoboda v. Board of Trustees of the Village of Sugar Grove Police Pension Fund*, 2015 IL App (2d) 150265, ¶ 19.

¶ 38 It is true that ordinary citizens may at some point utilize the "parallel curb ascent" maneuver while riding a bicycle. This particular, precise, and individual move is certainly not unique to police officers. However, what *is* unique to police officers, and in particular in this case, *bicycle*-patrol officers, is that the officers must perform this maneuver *while on patrol*. This means the officer must use the learned skill as a safety maneuver, a diversive maneuver, or as an assertive maneuver in a felony pursuit. Regardless, the officer would be performing the maneuver while experiencing the associated risks and dangers unique to the police profession. Plaintiff was learning how to perform the maneuver in the capacity of a bicycle-patrol officer.

¶ 39　　　　　　Based on the facts regarding the nature of the training, we conclude plaintiff was injured while acting in a capacity that involved special risk. Plaintiff was performing or learning to perform the duties of a bicycle-patrol officer at the time of the injury. She was learning to keep her "attention and energies directed towards being prepared to deal with any eventuality." See *Johnson*, 114 Ill. 2d at 522. With that mindset, she faced special risks not assumed by ordinary citizens riding a bicycle. See *Fedorski v. Board of Trustees of the Aurora Police Pension Fund*, 375 Ill. App. 3d 371, 375 (2007) (noting the fact the injury could have befallen anybody traveling in an automobile does not by itself foreclose a line-of-duty disability pension; the focus is not on the precise mechanism of the injury but on the capacity in which the officer was acting when injured and, in particular, the special risks a police officer faces when acting in such a capacity). Even though any ordinary citizen could realistically perform a "parallel curb ascent," plaintiff did so in the capacity of a bicycle-patrol officer, facing the associated risks of police patrol. Accordingly, we conclude that the record before us, the pertinent common-law authority, and the Pension Code support the circuit court's finding that the Board's decision to deny plaintiff line-of-duty disability pension benefits was clearly erroneous.

¶ 40　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 41　　　　　　For the reasons stated, we affirm the circuit court's judgment reversing the Board.

¶ 42　　　　　　Affirmed.